JUDGE CEDARBAUM

# 11 CIV 4489

BETANCOURT, VAN HEMMEN, GRECO & KENYON LLC
Attorneys for Plaintiff
46 Trinity Place
New York, New York 10006
212-297-0050
Todd P. Kenyon (TK7654)
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVE
JUN 30 2011
U.S.D.C. S.D.N.Y.
CASHIERS

------------------------------------------------------------------X

HEIDMAR TRADING LLC                          :
                                             :
                    Plaintiff,               :        11 Civ.
                                             :
     -against-                               :
                                             :        **COMPLAINT**
EMIRATES TRADING AGENCY LLC,                 :
                                             :
                    Defendant.               :
------------------------------------------------------------------X

Plaintiff, Heidmar Trading LLC ("Heidmar"), by and through its attorneys,

Betancourt, Van Hemmen, Greco & Kenyon LLC, for its Complaint against Emirates

Trading Agency LLC ("ETA"), alleges upon information and belief as follows:

1.     Heidmar is a business entity organized under the laws of the Marshall

Islands, with a principal place of business at 20 Glover Avenue, Norwalk, Connecticut.

2.     Defendant ETA is a business entity organized under the laws of the United

Arab Emirates, with a principal place of business at Ascon House, P.O. Box 5239,

Salahuddin Road, Dubai, U.A.E ("Ascon House").

3.     Defendant ETA has consented to jurisdiction and venue in this court

pursuant to contract.

4.      This Complaint alleges admiralty and maritime claims and this Court has admiralty jurisdiction over such claims pursuant to 28 U.S.C. § 1333.

5.      During 2008, Heidmar and ETA entered into a series of commodity swap contracts for vessel fuel oil, commonly known as bunkers ("Bunker Swap Contracts").

6.      ETA owns or manages a fleet of dry bulk cargo vessels that operate in the international waterborne trade and carry dry bulk cargoes.

7.      To operate the vessels in the bulk cargo trade, ETA physically procures bunkers for supply to the vessels on a regular basis at various ports in their trading range.

8.      Bunkers are a fundamental component of such maritime commerce.

9.      For ETA, the express purpose of the Bunker Swap Contracts was not for speculation, but to hedge the market risks associated with the need to supply bunkers to its fleet of ocean-going dry bulk cargo vessels.

10.     ETA carries dry bulk cargo pursuant to contracts of affreightment or charter parties with other parties, where the source of revenue is either charter hire or freight.

11.     The cost of bunkers is a significant factor for owners or operators of ocean-going vessels, with bunker costs subject to volatile market fluctuations, which can severely affect the net revenue received for any one voyage to carry bulk cargo from load port to discharge port pursuant to a contract of affreightment or charter party.

2

12.     To protect against such market fluctuations, ETA through the Bunker Swap Contracts sought to achieve a fixed price during certain set time periods for the bunker requirements of its bulk cargo vessels.

13.     Through agreement with Heidmar, the Bunker Swap Contracts set a fixed price for a specific quantity of bunkers each month.

14.     The fixed price and quantity were set with reference to ETA's price and quantity requirements for its bulk cargo vessels.

15.     Along with a fixed price, the Bunker Swap Contracts also contained a floating commodity reference price, which was "Singapore HSFO 380 cst", with "HSFO" meaning "High Sulphur Fuel Oil" and "380 cst" referring to its viscosity.

16.     ETA used "Singapore HSFO 380 cst" as the reference price since it best matched the purchase area where ETA would physically procure bunkers for its bulk cargo vessels.

17.     The Bunker Swap Contracts were agreements to pay the difference between the fixed price agreed at contracting and the future floating price of bunkers based on the "Singapore HSFO 380 cst" reference price.

18.     Each month the Bunker Swap Contracts were to be settled based on the fixed and floating commodity reference prices and the monthly quantity.

3

19.     If the floating commodity reference price was above the fixed price for the month, Heidmar owed an amount to ETA based on the price difference and the quantity; if the floating commodity reference price was below the fixed price, ETA owed an amount to Heidmar based on the price difference and the quantity.

20.     The Bunker Swap Contracts hedged or limited ETA's risks as a vessel owner and operator to fluctuations in the cost of bunkers above the fixed price, thus allowing ETA to reliably predict the bunker costs of operating its dry bulk cargo vessels for the duration of the Bunker Swap Contracts.

21.     Through the Bunker Swap Contracts, Heidmar provided a maritime service to ETA to hedge the market risks associated with the supply of bunkers to its fleet of ocean-going dry bulk cargo vessels.

22.     The Bunker Swap Contracts are maritime contracts for purposes of this court's admiralty jurisdiction.

23.     The specific Bunker Swap Contracts forming the basis of this Complaint are attached hereto as Exhibits 1 through 3 and were dated July 23, 2008 (Contracts BK08070025 and BK08070025A) and August 28, 2008 (Contract FO-0808009).

24.     ETA failed to meets its monthly obligations to settle the amounts due and owing to Heidmar under the Bunker Swap Contracts, and as of February 20, 2009, the exposure to Heidmar on a mark to market basis totaled $24,224,659.

4

25.     On February 1, 2009, Heidmar and ETA entered into a Special Payment Schedule Agreement whereby ETA promised to pay a minimum of $500,000 per month until ETA's obligations under the Bunker Swap Contracts were satisfied.

26.     ETA has failed to meet its minimum monthly payment obligations under the Special Payment Agreement.

27.     ETA has breached its obligations under the Bunker Swap Contracts and the Special Payment Schedule Agreement, which has caused damage to Heidmar.

28.     The amount due and owing to Heidmar as a result of ETA's breaches presently totals $6,903,688.40, which includes a principal amount of $6,366,891.20, and interest of $536,797.20 (accrued as of June 30, 2011), which interest continues to accrue at the rate as stated in the "Settlement and Payment" terms of the attached Bunker Swap Contracts.

WHEREFORE, Plaintiff prays:

A.     That process in due form of law issue against defendant ETA, citing it to appear and answer the matters alleged in this Complaint, and that judgment in favor of Plaintiff be entered against defendant ETA in the amount of $6,903,688.40, plus interest that accrues after June 30, 2011, pursuant to the Bunker Swap Contracts, plus costs and attorneys fees; and

5

B.   That this Court grant Plaintiff such other, further and different relief as is

deemed just and proper.

Dated: June 30, 2011

<div style="margin-left: 40%;">

BETANCOURT, VAN HEMMEN, GRECO & KENYON LLC
Attorneys for Plaintiff

By _____

Todd P. Kenyon (TK 7654)
Attorneys for Plaintiff
46 Trinity Place
New York, New York 10006
212-297-0050

</div>

6

# EXHIBIT 1

Heidmar Trading LLC
20 Glover Avenue
Norwalk, CT 06850 USA

DATE:  July 23, 2008

TO:   Emirates Trading Agency LLC ("COUNTERPARTY")

TEL:   +971 4 7073270

ATTN:  Mohamed Jamil

FAX:   +971 4 2714849

FROM:  Heidmar Trading LLC
       20 Glover Avenue
       Norwalk, CT 06850 USA

       Operations Contact:    Gary Lawson
              Phone:          (203) 662-2625
              Fax:            (203) 662-2771

RE:    Commodity Swap/Cap – Cash Settlement

HTLLC reference number: / BK08070025

Dear Sir/Madam:

The purpose of this letter ("Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Agreement specified below.

1.  The parties agree to negotiate in good faith a master netting agreement ("Master Agreement"). Upon execution of the Master Agreement, this Confirmation shall supplement, form a part of, and be subject to, the Master Agreement, as amended and supplemented from time to time (the "Agreement") between you and us, which Agreement will then govern this Confirmation except as expressly modified in Section 2 below. For avoidance of doubt, upon execution of the Master Agreement, the terms and conditions of Sections 3 through 8 shall be superseded by the terms and conditions of the Master Agreement.

2.  The Terms of the Transaction to which this Confirmation relates are as follows:

| Notional Quantity Per Calculation Period: | 3,000 Mt Per Settlement |
| Total Notional Quantity: | 9,000 Metric Tons TOTAL |

HTLLC reference number: / BK08050025 Version 1

| | |
|---|---|
| Commodity: | As per Commodity Reference Price |
| Trade Date: | July 22, 2008 |
| Effective Date: | January 01, 2009 |
| Termination Date: | March 31, 2009 |
| Calculation Period: | Each Calendar Month period during the Term of the Transaction |
| Period End Date(s): | Final Pricing Date of each Calculation Period as defined in the description of Floating Price. |
| Payment Date(s): | 5 Business days following each Period End Date, subject to adjustment in accordance with the Following Business Day Convention. |

**Fixed Amount Details**

| | |
|---|---|
| Fixed Price Payor: | Emirates Trading Agency LLC |
| Fixed Price: | 638.00 USD per Metric Ton |
| Cap Price: | 780.00 USD per Metric Ton |

**Floating Amount Details**

| | |
|---|---|
| Floating Price Payor: | Heidmar Trading LLC. (COUNTERPARTY) |
| Commodity Reference Price: | Singapore HSFO 380 Cst |
| Pricing Date(s): | From and including January 1, 2009 to and including March 31, 2009. |
| Floating Price: | The average of the Platts Oilgram Midpoint Price Assessments for Singapore HSFO 380 Cst for each successive day of the Calculation Period during which such prices are quoted. |
| Method of Averaging: | Un-weighted |
| Rounding: | The Floating Price will be rounded to 3 decimal places. |
| Market Disruption Events: | Price Source Disruption; Trading Suspension; Disappearance of Commodity Reference Price; Material Change in Formula; Material Change in Content; Tax Disruption and Trading Limitation. |

Fallback Reference Price; with the next applicable Disruption Fallback to be Negotiated Fallback; with the next applicable Disruption Fallback to be Dealer Fallback; and with the next applicable Disruption Fallback to be No Fault Termination.

"Dealer Fallback" means that, promptly upon becoming aware of the Market Disruption Event or Additional Market Disruption Event, the parties shall expeditiously and jointly agree upon three independent leading dealers in the relevant underlying commodity market selected in good faith (A) from among dealers of the highest credit standing which satisfy all the criteria that the parties apply generally at the time of in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is affected by the Market Disruption Event or Additional Market Disruption

HTLLC reference number: / BK08050025 Version 1

Event, and (B) to the extent practicable, from among dealers having an office in the same city. Such Dealers shall be appointed to make a determination of the Relevant Price taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant. The Relevant Price shall be the arithmetic mean of the three amounts determined to be the relevant price by such dealer, in which case such calculation shall be binding and conclusive absent manifest error. If the parties have not agreed upon the appointment of the dealers on or before the sixth Business Day following the first Pricing Date on which the Market Disruption Event or Additional Market Disruption Event occurred or existed, or if a determination of the Relevant Price cannot be obtained from at least three dealers, the next applicable Disruption Fallback shall apply to the Transaction.

| | |
|---|---|
| Calculation Agent: | HEIDMAR TRADING LLC |
| Business Day: | New York Banks |

3.   Definitions

All terms in this Confirmation not defined herein shall have the meanings set forth in the 2000 ISDA Definitions and the 1993 ISDA Commodity Derivatives Definitions, as supplemented by the 2000 Supplement to the 1993 ISDA Commodity Derivatives Definitions, in each case as published by the International Swaps and Derivatives Association, Inc.

4.   Settlement and Payment

Promptly after Each Period End Date, HEIDMAR TRADING LLC shall calculate the Fixed Amount and the Floating Amount and notify the Counterparty of such amount. If HEIDMAR TRADING LLC fails to promptly so notify Counterparty, it shall determine such amounts and shall make payment or give notice to HEIDMAR TRADING LLC accordingly.

If the Fixed Amount exceeds the Floating Amount for such Calculation Period, the Fixed Price Payor shall pay the Floating Price Payor an amount equal to such excess. If the Floating Amount exceeds the Fixed Amount for such Calculation Period, the Floating Price Payor shall pay the Fixed Price Payor an amount equal to such excess.

Payment shall be made no later than 12 noon of the relevant Payment Date, without offset, deduction, discount or counterclaim (except as provided in Section 6 below), in USD in immediately available funds to the bank account in New York, New York designated by the party to which payment is due in an invoice or other written notice. Any amount not paid when due shall accrue interest at the rate of two percent (2%) above the prime commercial rate charged by Citibank, NA, New York, compounded annually from the due date or the maximum rate allowed by law, if lower.

5.   Representations and Warranties

Each party represents and warrants to the other party as of the date hereof that:

a.   It is duly organised and existing under the laws of the jurisdiction of its organisation and has full power and legal right to execute, deliver and perform this Agreement.

b.   Its execution, delivery and performance of this Agreement has been duly authorized by all necessary actions and do not contravene any legal or contractual restriction binding on or affecting it, and the person signing this Confirmation is authorized and empowered to do so.

c.   It has obtained or submitted any authorization or approval or other action by, or notice to or filing with, any governmental authority or regulatory body that is required for the due execution, delivery and performance of this Agreement.

3

HTLLC reference number: / BK08050025 Version 1

d.      This Agreement constitutes its valid and legally binding obligations enforceable against it in accordance with its terms, except as may be limited by bankruptcy, reorganization, moratorium or similar laws affecting creditors' rights generally.

e.      No Event of Default (as defined below), or event which with notice and/or lapse of time would constitute an Event of Default, has occurred with respect to it.

f.      No litigation, arbitration or administrative proceeding is current or pending or, so far as it is aware, threatened against it which would, if adversely determined, have a material adverse effect on its financial condition or its ability to perform its obligations hereunder.

g.      It has entered into this Agreement in connection with its line of business (including financial intermediation services) and the terms hereof have been individually tailored and negotiated at arms length between the parties.

h.      It is an "eligible contract participant" as defined in Section 1a (12) of the Commodity Exchange Act as amended.

i.      It is not relying upon any representations of the other party other than those expressly set forth herein or any written guarantee of the obligations hereof.

j.      It has entered into this Agreement as principal (and not as agent or in any other capacity, fiduciary or otherwise).

k.      It has entered into this Agreement with a full understanding of the material terms and risks hereof, and it is capable of assuming those risks.

l.      It has made its investment and trading decisions (including regarding the suitability hereof) based upon its own judgment and any advice from such advisors as it has deemed necessary, and not in reliance upon any view expressed by the other party.

m.      The other party is not acting as a fiduciary or an advisor for it, nor has given to it any assurance or guarantee as to the expected performance or result of this Agreement.

6.  Non-Performance

a.      The occurrence at any time with respect to either party or, if the obligations of such party hereunder are guaranteed by a third party (its "Guarantor"), with respect to its Guarantor, of any of the following events constitutes an event of default ("Event of Default") with respect to such party (the "Defaulting Party"):

   i.      The Defaulting Party fails to pay or perform any obligation when due hereunder or under any other commodity swap, option, cap, floor, collar, forward or similar transaction between the parties ("Other Commodity Transactions"), and such failure continues, after receipt of written notice thereof, for more than two Business Days in the case of non-payment (including, without limitation, non-payment of collateral) and thirty days in the case of any other such obligation.

   ii.     The Defaulting Party or its Guarantor repudiates its obligations hereunder or under the guarantee, as the case may be.

   iii.    Any representation or warranty made by the Defaulting Party hereunder, or by its Guarantor under the guarantee, proves to have been false or misleading in any material respect as of the time it was made.

4

iv. The Defaulting Party or its Guarantor becomes bankrupt or insolvent, however evidenced, or is unable (or admits in writing its inability) generally to pay its debts as they become due, or makes a general assignment for the benefit of creditors.

v. The Defaulting Party or its Guarantor files or otherwise commences, or has filed or commenced against it, a proceeding under any bankruptcy, insolvency, reorganization or similar law for the protection of creditors, or the application for appointment of a receiver, custodian or similar person, or the passing of a resolution for winding up or liquidation by it or on its behalf.

b. If any event of default shall have occurred and be continuing, then the other party (the "Performing Party") shall have the right to designate an Early Termination Date upon at least one (1) Business Day's notice to the Defaulting Party (except in the case of an event under Clauses 6(a)(iv) or 6(a)(v) above, in which event an Early Termination Date shall be deemed to have occurred immediately prior to such event and no prior notice shall be required) and to liquidate this Transaction and all Other Commodity Transactions then outstanding by:

i. closing out and liquidating each such Transaction, so that each such Transaction is terminated, and calculating a Settlement Payment (as defined below) for each such Transaction payable to one party from the other, as appropriate, and any Breakage Costs (as defined below) incurred by the Performing Party, and

ii. setting off (1) all such Settlement Payments owing to the Defaulting Party plus (at the Performing Party's election) any or all other amounts due to the Defaulting Party under this Transaction or under any Other Commodity Transaction; (2) all such Settlement Payments owing to the Performing Party plus any or all Breakage Costs, plus (at the Performing Party's election) any and all other amounts due to the Performing Party under this Transaction or any other Commodity Transaction; and (3) all collateral held by either party to secure the obligations of the other party, so that all such amounts shall be aggregated and/or netted to a single liquidated amount payable within one Business Day by the party owing the greater such amount to the other party.

c. For the purpose of this Section 6, "Settlement Payment" means with respect to this Transaction and any outstanding Other Commodity Transactions, an amount representing each such Transaction's market value (in US dollars) to the party entitled to receive compensation for the early termination thereof, determined as of, or about the time, such transaction is liquidated by the Performing Party in any commercially reasonable manner. "Breakage Costs" means all costs and losses which the Performing Party may incur as a result of its terminating and liquidating this Transaction and any Other Commodity Transaction under this non-performance clause, including without limitation, loss of bargain, costs and losses incurred in maintaining, terminating and/or re-establishing any hedge or related trading positions, except for amounts covered by the settlement payment for such transaction.

d. If the Performing Party owes any amount pursuant to Section 6(b), at its election, it may set off any or all of such amount against any or all amounts then due and owing by the Defaulting Party to the Performing Party under any other agreement or arrangement.

e. The Performing Party's rights under this Section 6 shall be in addition to, and not in limitation or exclusion of, any other rights which the Performing Party may have (whether by agreement, operation of law, or otherwise). This Agreement constitutes a swap agreement for the purposes of Section 560 of the US Bankruptcy Code.

7.   Miscellaneous

Neither party may assign its rights or its obligations hereunder without the prior written consent of the other party.

8.   Governing Law

This contract shall be governed by New York law (without reference to choice of law doctrine). Each party expressly submits to the exclusive jurisdiction of the Federal and State Courts located in the State of New York, and waives any right it may have to a trial by jury in respect to any proceeding relating to this Confirmation or the Transaction.

Not Applicable

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by returning via facsimile an executed copy of this Confirmation, or by sending a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the transaction to which this confirmation relates and indicates agreement to those terms, in either case within three (3) Business Days of your receipt of this Confirmation, to the above Operations Contact.

Failure to respond within such period will not affect the validity or enforceability of this Transaction, and shall be deemed to be an affirmation of the terms and conditions contained herein, absent manifest error.

Regards,

Heidmar Trading LLC
Gary W. Lawson
Bunker Trading Manager

ACKNOWLEDGED AND AGREED;

Emirates Trading Agency LLC ("COUNTERPARTY")

By: _Mr. Mohamed Anbar_
Title: _Management Executive._

HTLLC reference number: / BK08050025 Version 1

# EXHIBIT 2

Heidmar Trading LLC
20 Glover Avenue
Norwalk, CT 06850 USA

DATE:   July 23, 2008

TO:     Emirates Trading Agency LLC ("COUNTERPARTY")

TEL:    +971 4 7073270

ATTN:   Mohamed Jamil

FAX:    +971 4 2714849

FROM:   Heidmar Trading LLC
        20 Glover Avenue
        Norwalk, CT 06850 USA

        Operations Contact:     Gary Lawson
             Phone:             (203) 662-2625
             Fax:               (203) 662-2771

RE:     Commodity Swap/Cap – Cash Settlement

HTLLC reference number: / BK08070025A

Dear Sir/Madam:

The purpose of this letter ("Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Agreement specified below.

1.  The parties agree to negotiate in good faith a master netting agreement ("Master Agreement"). Upon execution of the Master Agreement, this Confirmation shall supplement, form a part of, and be subject to, the Master Agreement, as amended and supplemented from time to time (the "Agreement") between you and us, which Agreement will then govern this Confirmation except as expressly modified in Section 2 below. For avoidance of doubt, upon execution of the Master Agreement, the terms and conditions of Sections 3 through 8 shall be superseded by the terms and conditions of the Master Agreement.

2.  The Terms of the Transaction to which this Confirmation relates are as follows:

Notional Quantity Per
Calculation Period:          2,000 Mt Per Settlement

Total Notional Quantity:     6,000 Metric Tons TOTAL

HTLLC reference number: / BK08050025A Version 1

| | |
|---|---|
| Commodity: | As per Commodity Reference Price |
| Trade Date: | July 22, 2008 |
| Effective Date: | January 01, 2009 |
| Termination Date: | March 31, 2009 |
| Calculation Period: | Each Calendar Month period during the Term of the Transaction |
| Period End Date(s): | Final Pricing Date of each Calculation Period as defined in the description of Floating Price. |
| Payment Date(s): | 5 Business days following each Period End Date, subject to adjustment in accordance with the Following Business Day Convention. |

**Fixed Amount Details**

| | |
|---|---|
| Fixed Price Payor: | Emirates Trading Agency LLC |
| Fixed Price: | 638.00 USD per Metric Ton |
| Cap Price: | 780.00 USD per Metric Ton |

**Floating Amount Details**

| | |
|---|---|
| Floating Price Payor: | Heidmar Trading LLC. (COUNTERPARTY) |
| Commodity Reference Price: | Singapore HSFO 380 Cst |
| Pricing Date(s): | From and including January 1, 2009 to and including March 31, 2009. |
| Floating Price: | The average of the Platts Oilgram Midpoint Price Assessments for Singapore HSFO 380 Cst for each successive day of the Calculation Period during which such prices are quoted. |
| Method of Averaging: | Un-weighted |
| Rounding: | The Floating Price will be rounded to 3 decimal places. |
| Market Disruption Events: | Price Source Disruption; Trading Suspension; Disappearance of Commodity Reference Price; Material Change in Formula; Material Change in Content; Tax Disruption and Trading Limitation. |

Fallback Reference Price; with the next applicable Disruption Fallback to be Negotiated Fallback; with the next applicable Disruption Fallback to be Dealer Fallback; and with the next applicable Disruption Fallback to be No Fault Termination.

"Dealer Fallback" means that, promptly upon becoming aware of the Market Disruption Event or Additional Market Disruption Event, the parties shall expeditiously and jointly agree upon three independent leading dealers in the relevant underlying commodity market selected in good faith (A) from among dealers of the highest credit standing which satisfy all the criteria that the parties apply generally at the time of in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is affected by the Market Disruption Event or Additional Market Disruption

2

Event, and (B) to the extent practicable, from among dealers having an office in the same city. Such Dealers shall be appointed to make a determination of the Relevant Price taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant. The Relevant Price shall be the arithmetic mean of the three amounts determined to be the relevant price by such dealer, in which case such calculation shall be binding and conclusive absent manifest error. If the parties have not agreed upon the appointment of the dealers on or before the sixth Business Day following the first Pricing Date on which the Market Disruption Event or Additional Market Disruption Event occurred or existed, or if a determination of the Relevant Price cannot be obtained from at least three dealers, the next applicable Disruption Fallback shall apply to the Transaction.

|   |   |
|---|---|
| Calculation Agent: | HEIDMAR TRADING LLC |
| Business Day: | New York Banks |

3.    Definitions

All terms in this Confirmation not defined herein shall have the meanings set forth in the 2000 ISDA Definitions and the 1993 ISDA Commodity Derivatives Definitions, as supplemented by the 2000 Supplement to the 1993 ISDA Commodity Derivatives Definitions, in each case as published by the International Swaps and Derivatives Association, Inc.

4.    Settlement and Payment

Promptly after Each Period End Date, HEIDMAR TRADING LLC shall calculate the Fixed Amount and the Floating Amount and notify the Counterparty of such amount. If HEIDMAR TRADING LLC fails to promptly so notify Counterparty, it shall determine such amounts and shall make payment or give notice to HEIDMAR TRADING LLC accordingly.

If the Fixed Amount exceeds the Floating Amount for such Calculation Period, the Fixed Price Payor shall pay the Floating Price Payor an amount equal to such excess. If the Floating Amount exceeds the Fixed Amount for such Calculation Period, the Floating Price Payor shall pay the Fixed Price Payor an amount equal to such excess.

Payment shall be made no later than 12 noon of the relevant Payment Date, without offset, deduction, discount or counterclaim (except as provided in Section 6 below), in USD in immediately available funds to the bank account in New York, New York designated by the party to which payment is due in an invoice or other written notice. Any amount not paid when due shall accrue interest at the rate of two percent (2%) above the prime commercial rate charged by Citibank, NA, New York, compounded annually from the due date or the maximum rate allowed by law, if lower.

5.    Representations and Warranties

Each party represents and warrants to the other party as of the date hereof that:

a.    It is duly organised and existing under the laws of the jurisdiction of its organisation and has full power and legal right to execute, deliver and perform this Agreement.

b.    Its execution, delivery and performance of this Agreement has been duly authorized by all necessary actions and do not contravene any legal or contractual restriction binding on or affecting it, and the person signing this Confirmation is authorized and empowered to do so.

c.    It has obtained or submitted any authorization or approval or other action by, or notice to or filing with, any governmental authority or regulatory body that is required for the due execution, delivery and performance of this Agreement.

-------------------------------------------------------------------------------  3

HTLLC reference number: / BK08050025A Version 1

d.  This Agreement constitutes its valid and legally binding obligations enforceable against it in accordance with its terms, except as may be limited by bankruptcy, reorganization, moratorium or similar laws affecting creditors' rights generally.

e.  No Event of Default (as defined below), or event which with notice and/or lapse of time would constitute an Event of Default, has occurred with respect to it.

f.  No litigation, arbitration or administrative proceeding is current or pending or, so far as it is aware, threatened against it which would, if adversely determined, have a material adverse effect on its financial condition or its ability to perform its obligations hereunder.

g.  It has entered into this Agreement in connection with its line of business (including financial intermediation services) and the terms hereof have been individually tailored and negotiated at arms length between the parties.

h.  It is an "eligible contract participant" as defined in Section 1a (12) of the Commodity Exchange Act as amended.

i.  It is not relying upon any representations of the other party other than those expressly set forth herein or any written guarantee of the obligations hereof.

j.  It has entered into this Agreement as principal (and not as agent or in any other capacity, fiduciary or otherwise).

k.  It has entered into this Agreement with a full understanding of the material terms and risks hereof, and it is capable of assuming those risks.

l.  It has made its investment and trading decisions (including regarding the suitability hereof) based upon its own judgment and any advice from such advisors as it has deemed necessary, and not in reliance upon any view expressed by the other party.

m.  The other party is not acting as a fiduciary or an advisor for it, nor has given to it any assurance or guarantee as to the expected performance or result of this Agreement.

6.  Non-Performance

a.  The occurrence at any time with respect to either party or, if the obligations of such party hereunder are guaranteed by a third party (its "Guarantor"), with respect to its Guarantor, of any of the following events constitutes an event of default ("Event of Default") with respect to such party (the "Defaulting Party"):

    i.  The Defaulting Party fails to pay or perform any obligation when due hereunder or under any other commodity swap, option, cap, floor, collar, forward or similar transaction between the parties ("Other Commodity Transactions"), and such failure continues, after receipt of written notice thereof, for more than two Business Days in the case of non-payment (including, without limitation, non-payment of collateral) and thirty days in the case of any other such obligation.

    ii.  The Defaulting Party or its Guarantor repudiates its obligations hereunder or under the guarantee, as the case may be.

    iii.  Any representation or warranty made by the Defaulting Party hereunder, or by its Guarantor under the guarantee, proves to have been false or misleading in any material respect as of the time it was made.

4

      iv.    The Defaulting Party or its Guarantor becomes bankrupt or insolvent, however evidenced, or is unable (or admits in writing its inability) generally to pay its debts as they become due, or makes a general assignment for the benefit of creditors.

      v.    The Defaulting Party or its Guarantor files or otherwise commences, or has filed or commenced against it, a proceeding under any bankruptcy, insolvency, reorganization or similar law for the protection of creditors, or the application for appointment of a receiver, custodian or similar person, or the passing of a resolution for winding up or liquidation by it or on its behalf.

b.    If any event of default shall have occurred and be continuing, then the other party (the "Performing Party") shall have the right to designate an Early Termination Date upon at least one (1) Business Day's notice to the Defaulting Party (except in the case of an event under Clauses 6(a)(iv) or 6(a)(v) above, in which event an Early Termination Date shall be deemed to have occurred immediately prior to such event and no prior notice shall be required) and to liquidate this Transaction and all Other Commodity Transactions then outstanding by:

      i.    closing out and liquidating each such Transaction, so that each such Transaction is terminated, and calculating each a Settlement Payment (as defined below) for each such Transaction payable to one party from the other, as appropriate, and any Breakage Costs (as defined below) incurred by the Performing Party, and

      ii.    setting off (1) all such Settlement Payments owing to the Defaulting Party plus (at the Performing Party's election) any or all other amounts due to the Defaulting Party under this Transaction or under any Other Commodity Transaction; (2) all such Settlement Payments owing to the Performing Party plus any or all Breakage Costs, plus (at the Performing Party's election) any and all other amounts due to the Performing Party under this Transaction or any other Commodity Transaction; and (3) all collateral held by either party to secure the obligations of the other party, so that all such amounts shall be aggregated and/or netted to a single liquidated amount payable within one Business Day by the party owing the greater such amount to the other party.

c.    For the purpose of this Section 6, "Settlement Payment" means with respect to this Transaction and any outstanding Other Commodity Transactions, an amount representing each such Transaction's market value (in US dollars) to the party entitled to receive compensation for the early termination thereof, determined as of, or about the time, such transaction is liquidated by the Performing Party in any commercially reasonable manner. "Breakage Costs" means all costs and losses which the Performing Party may incur as a result of its terminating and liquidating this Transaction and any Other Commodity Transaction under this non-performance clause, including without limitation, loss of bargain, costs and losses incurred in maintaining, terminating and/or re-establishing any hedge or related trading positions, except for amounts covered by the settlement payment for such transaction.

d.    If the Performing Party owes any amount pursuant to Section 6(b), at its election, it may set off any or all of such amount against any or all amounts then due and owing by the Defaulting Party to the Performing Party under any other agreement or arrangement.

e.    The Performing Party's rights under this Section 6 shall be in addition to, and not in limitation or exclusion of, any other rights which the Performing Party may have (whether by agreement, operation of law, or otherwise). This Agreement constitutes a swap agreement for the purposes of Section 560 of the US Bankruptcy Code.

---

    5

7.      Miscellaneous
        Neither party may assign its rights or its obligations hereunder without the prior written consent of the other party.

8.      Governing Law

        This contract shall be governed by New York law (without reference to choice of law doctrine). Each party expressly submits to the exclusive jurisdiction of the Federal and State Courts located in the State of New York, and waives any right it may have to a trial by jury in respect to any proceeding relating to this Confirmation or the Transaction.

        Not Applicable


Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by returning via facsimile an executed copy of this Confirmation, or by sending a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the transaction to which this confirmation relates and indicates agreement to those terms, in either case within three (3) Business Days of your receipt of this Confirmation, to the above Operations Contact.

Failure to respond within such period will not affect the validity or enforceability of this Transaction, and shall be deemed to be an affirmation of the terms and conditions contained herein, absent manifest error.


Regards,

Heidmar Trading LLC
Gary W. Lawson
Bunker Trading Manager


ACKNOWLEDGED AND AGREED:

Emirates Trading Agency LLC ("COUNTERPARTY")

By: _Mr. Mahomed Azhar_

Title: _MANAGEMENT EXECUTIVE_


---

HTLLC reference number: / BK08050025A Version 1

# EXHIBIT 3

Heidmar Trading LLC
20 Glover Avenue
Norwalk, CT 06850

DATE: August 28, 2008

TO:      Emirates Trading Agency LLC ("COUNTERPARTY")
         Salahuddin Road
         Dubai
         United Arab Emirates


TEL:     +971 (4) 7073638

ATTN:    Waseem Raja

FAX:     +971 (4) 2732511

FROM:    Heidmar Trading LLC
         20 Glover Avenue
         Norwalk, CT 06850 USA

         Operations Contact:     Gary Lawson
                  Phone:         (203) 662-2625
                  Fax:           (203) 662-2771

RE:      Commodity/Cap Swap - Cash Settled

HTLLC reference number: / FO-08080009

Dear Sir/Madam:

The purpose of this letter ("Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Agreement specified below.

1.  The parties agree to negotiate in good faith a master netting agreement ("Master Agreement"). Upon execution of the Master Agreement, this Confirmation shall supplement, form a part of, and be subject to, the Master Agreement, as amended and supplemented from time to time (the "Agreement") between you and us, which Agreement will then govern this Confirmation except as expressly modified in Section 2 below. For avoidance of doubt, upon execution of the Master Agreement, the terms and conditions of Sections 3 through 8 shall be superseded by the terms and conditions of the Master Agreement.

2.  The Terms of the Transaction to which this Confirmation relates are as follows:

Notional Quantity Per
Calculation Period:          4,400 Mt Per Settlement

Total Notional Quantity:     52,800 Metric Tons TOTAL

Commodity:                   As per Commodity Reference Price

HTLLC reference number: / BK08080009 Version 1

| | |
|---|---|
| Trade Date: | August 27, 2008 |
| Effective Date: | January 1, 2009 |
| Termination Date: | December 31, 2009 |
| Calculation Period: | Each Calendar Month period during the Term of the Transaction |
| Period End Date(s): | Final Pricing Date of each Calculation Period as defined in the description of Floating Price. |
| Payment Date(s): | 5 Business days following each Period End Date, subject to adjustment in accordance with the Following Business Day Convention. |

**Fixed Amount Details**

| | |
|---|---|
| Fixed Price Payor: | Emirates Trading Agency LLC |
| Fixed Price: | 596.25 USD per Metric Ton |
| Cap Price: | 703.50 USD per Metric Ton |

**Floating Amount Details**

| | |
|---|---|
| Floating Price Payor: | Heidmar Trading LLC. (COUNTERPARTY) |
| Commodity Reference Price: | Singapore HSFO 380 Cst |
| Pricing Date(s): | From and including January 1, 2009 to and including December 31, 2009. |
| Floating Price: | The average of the Platts Oilgram Midpoint Price Assessments for Singapore 380 Cst for each successive day of the Calculation Period during which such prices are quoted. |
| Method of Averaging: | Un-weighted |
| Rounding: | The Floating Price will be rounded to 3 decimal places. |
| Market Disruption Events: | Price Source Disruption; Trading Suspension; Disappearance of Commodity Reference Price; Material Change in Formula; Material Change in Content; Tax Disruption and Trading Limitation. |

Fallback Reference Price; with the next applicable Disruption Fallback to be Negotiated Fallback; with the next applicable Disruption Fallback to be Dealer Fallback; and with the next applicable Disruption Fallback to be No Fault Termination.

"Dealer Fallback" means that, promptly upon becoming aware of the Market Disruption Event or Additional Market Disruption Event, the parties shall expeditiously and jointly agree upon three independent leading dealers in the relevant underlying commodity market selected in good faith (A) from among dealers of the highest credit standing which satisfy all the criteria that the parties apply generally at the time of in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is affected by the Market Disruption Event or Additional Market Disruption Event, and (B) to the extent practicable, from among dealers having an office in the same city. Such Dealers shall be appointed to make a determination of the Relevant Price taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant. The Relevant Price shall be the

2

HTLLC reference number: / BK08080009 Version 1

arithmetic mean of the three amounts determined to be the relevant price by such dealer, in which case such calculation shall be binding and conclusive absent manifest error. If the parties have not agreed upon the appointment of the dealers on or before the sixth Business Day following the first Pricing Date on which the Market Disruption Event or Additional Market Disruption Event occurred or existed, or if a determination of the Relevant Price cannot be obtained from at least three dealers, the next applicable Disruption Fallback shall apply to the Transaction.

| | |
|---|---|
| Calculation Agent: | HEIDMAR TRADING LLC |
| Business Day: | New York Banks |

3.   Definitions

All terms in this Confirmation not defined herein shall have the meanings set forth in the 2000 ISDA Definitions and the 1993 ISDA Commodity Derivatives Definitions, as supplemented by the 2000 Supplement to the 1993 ISDA Commodity Derivatives Definitions, in each case as published by the International Swaps and Derivatives Association, Inc.

4.   Settlement and Payment

Promptly after Each Period End Date, HEIDMAR TRADING LLC shall calculate the Fixed Amount and the Floating Amount and notify the Counterparty of such amount. If HEIDMAR TRADING LLC fails to promptly so notify Counterparty, it shall determine such amounts and shall make payment or give notice to HEIDMAR TRADING LLC accordingly.

If the Fixed Amount exceeds the Floating Amount for such Calculation Period, the Fixed Price Payor shall pay the Floating Price Payor an amount equal to such excess. If the Floating Amount exceeds the Fixed Amount for such Calculation Period, the Floating Price Payor shall pay the Fixed Price Payor an amount equal to such excess.

Payment shall be made no later than 12 noon of the relevant Payment Date, without offset, deduction, discount or counterclaim (except as provided in Section 6 below), in USD in immediately available funds to the bank account in New York, New York designated by the party to which payment is due in an invoice or other written notice. Any amount not paid when due shall accrue interest at the rate of two percent (2%) above the prime commercial rate charged by Citibank, NA, New York, compounded annually from the due date or the maximum rate allowed by law, if lower.

5.   Representations and Warranties

Each party represents and warrants to the other party as of the date hereof that:

a.   It is duly organized and existing under the laws of the jurisdiction of its organization and has full power and legal right to execute, deliver and perform this Agreement.

b.   Its execution, delivery and performance of this Agreement has been duly authorized by all necessary actions and do not contravene any legal or contractual restriction binding on or affecting it, and the person signing this Confirmation is authorized and empowered to do so.

c.   It has obtained or submitted any authorization or approval or other action by, or notice to or filing with, any governmental authority or regulatory body that is required for the due execution, delivery and performance of this Agreement.

d.   This Agreement constitutes its valid and legally binding obligations enforceable against it in accordance with its terms, except as may be limited by bankruptcy, reorganization, moratorium or similar laws affecting creditors' rights generally.

3

HTLLC reference number: / BK08080009 Version 1

e.   No Event of Default (as defined below), or event which with notice and/or lapse of time would constitute an Event of Default, has occurred with respect to it.

f.   No litigation, arbitration or administrative proceeding is current or pending or, so far as it is aware, threatened against it which would, if adversely determined, have a material adverse effect on its financial condition or its ability to perform its obligations hereunder.

g.   It has entered into this Agreement in connection with its line of business (including financial intermediation services) and the terms hereof have been individually tailored and negotiated at arms length between the parties.

h.   It is an "eligible contract participant" as defined in Section 1a (12) of the Commodity Exchange Act as amended.

i.   It is not relying upon any representations of the other party other than those expressly set forth herein or any written guarantee of the obligations hereof.

j.   It has entered into this Agreement as principal (and not as agent or in any other capacity, fiduciary or otherwise).

k.   It has entered into this Agreement with a full understanding of the material terms and risks hereof, and it is capable of assuming those risks.

l.   It has made its investment and trading decisions (including regarding the suitability hereof) based upon its own judgment and any advice from such advisors as it has deemed necessary, and not in reliance upon any view expressed by the other party.

m.   The other party is not acting as a fiduciary or an advisor for it, nor has given to it any assurance or guarantee as to the expected performance or result of this Agreement.

6.   Non-Performance

a.   The occurrence at any time with respect to either party or, if the obligations of such party hereunder are guaranteed by a third party (its "Guarantor"), with respect to its Guarantor, of any of the following events constitutes an event of default ("Event of Default") with respect to such party (the "Defaulting Party"):

   i.   The Defaulting Party fails to pay or perform any obligation when due hereunder or under any other commodity swap, option, cap, floor, collar, forward or similar transaction between the parties ("Other Commodity Transactions"), and such failure continues, after receipt of written notice thereof, for more than two Business Days in the case of non-payment (including, without limitation, non-payment of collateral) and thirty days in the case of any other such obligation.

   ii.   The Defaulting Party or its Guarantor repudiates its obligations hereunder or under the guarantee, as the case may be.

   iii.   Any representation or warranty made by the Defaulting Party hereunder, or by its Guarantor under the guarantee, proves to have been false or misleading in any material respect as of the time it was made.

   iv.   The Defaulting Party or its Guarantor becomes bankrupt or insolvent, however evidenced, or is unable (or admits in writing its inability) generally to pay its debts as they become due, or makes a general assignment for the benefit of creditors.

4

v.     The Defaulting Party or its Guarantor files or otherwise commences, or has filed or commenced against it, a proceeding under any bankruptcy, insolvency, reorganization or similar law for the protection of creditors, or the application for appointment of a receiver, custodian or similar person, or the passing of a resolution for winding up or liquidation by it or on its behalf.

b.     If any event of default shall have occurred and be continuing, then the other party (the "Performing Party") shall have the right to designate an Early Termination Date upon at least one (1) Business Day's notice to the Defaulting Party (except in the case of an event under Clauses 6(a)(iv) or 6(a)(v) above, in which event an Early Termination Date shall be deemed to have occurred immediately prior to such event and no prior notice shall be required) and to liquidate this Transaction and all Other Commodity Transactions then outstanding by:

i.     closing out and liquidating each such Transaction, so that each such Transaction is terminated, and calculating a Settlement Payment (as defined below) for each such Transaction payable to one party from the other, as appropriate, and any Breakage Costs (as defined below) incurred by the Performing Party, and

ii.     setting off (1) all such Settlement Payments owing to the Defaulting Party plus (at the Performing Party's election) any or all other amounts due to the Defaulting Party under this Transaction or under any Other Commodity Transaction; (2) all such Settlement Payments owing to the Performing Party plus any or all Breakage Costs, plus (at the Performing Party's election) any and all other amounts due to the Performing Party under this Transaction or any other Commodity Transaction; and (3) all collateral held by either party to secure the obligations of the other party, so that all such amounts shall be aggregated and/or netted to a single liquidated amount payable within one Business Day by the party owing the greater such amount to the other party.

c.     For the purpose of this Section 6, "Settlement Payment" means with respect to this Transaction and any outstanding Other Commodity Transactions, an amount representing each such Transaction's market value (in US dollars) to the party entitled to receive compensation for the early termination thereof, determined as of, or about the time, such transaction is liquidated by the Performing Party in any commercially reasonable manner. "Breakage Costs" means all costs and losses which the Performing Party may incur as a result of its terminating and liquidating this Transaction and any Other Commodity Transaction under this non-performance clause, including without limitation, loss of bargain, costs and losses incurred in maintaining, terminating and/or re-establishing any hedge or related trading positions, except for amounts covered by the settlement payment for such transaction.

d.     If the Performing Party owes any amount pursuant to Section 6(b), at its election, it may set off any or all of such amount against any or all amounts then due and owing by the Defaulting Party to the Performing Party under any other agreement or arrangement.

e.     The Performing Party's rights under this Section 6 shall be in addition to, and not in limitation or exclusion of, any other rights which the Performing Party may have (whether by agreement, operation of law, or otherwise). This Agreement constitutes a swap agreement for the purposes of Section 560 of the US Bankruptcy Code.

7.     Miscellaneous
Neither party may assign its rights or its obligations hereunder without the prior written consent of the other party.

5

8.        Governing Law

          This contract shall be governed by New York law (without reference to choice of law doctrine). Each party expressly submits to the exclusive jurisdiction of the Federal and State Courts located in the State of New York, and waives any right it may have to a trial by jury in respect to any proceeding relating to this Confirmation or the Transaction.

          Not Applicable


Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by returning via facsimile an executed copy of this Confirmation, or by sending a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the transaction to which this confirmation relates and indicates agreement to those terms, in either case within three (3) Business Days of your receipt of this Confirmation, to the above Operations Contact.

Failure to respond within such period will not affect the validity or enforceability of this Transaction, and shall be deemed to be an affirmation of the terms and conditions contained herein, absent manifest error.


Regards,

Heidmar Trading LLC
Gary W. Lawson
Bunker Trading Manager

ACKNOWLEDGED AND AGREED:

_____

Emirates Trading Agency LLC ("COUNTERPARTY")

By: MOHAMMED AZHAR.

Title: MANAGEMENT EXECUTIVE

---

HT LLC reference number: / BK08080009 Version 1

6